**RAINES FELDMAN LLP**
KATHY BAZOIAN PHELPS (SBN 155564)
*kphelps@raineslaw.com*
DAVID A. CASTLEMAN (SBN 326812)
*dcastleman@raineslaw.com*
1800 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone:  (310) 440-4100
Facsimile: (310) 691-1943

*Counsel for Bradley D. Sharp,*
*Permanent Receiver*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADLEY D. SHARP, as the Permanent Receiver for the Estate of DIRECT LENDING INVESTMENTS, LLC, DIRECT LENDING INCOME FUND, L.P., DIRECT LENDING INCOME FEEDER FUND, LTD., DLI CAPITAL, INC., DLI LENDING AGENT, LLC AND DLI ASSETS BRAVO, LLC AND THEIR SUCCESSORS, SUBSIDIARIES, AND AFFILIATED ENTITIES,<br><br>Plaintiff,<br><br>v.<br><br>THE STRAWBERRY PEAK TRUST and PRIMUS TRUST CORPORATION *in its capacity as trustee for* THE STRAWBERRY PEAK TRUST,<br><br>Defendants. | Case No. 2:22-cv-789<br><br>**COMPLAINT FOR:**<br><br>**(1) AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS, AND**<br><br>**(2) AVOIDANCE AND RECOVERY OF CONSTRCUTIVE FRAUDULENT TRANSFERS**<br><br><u>**JURY TRIAL DEMANDED**</u><br><br>**[Cal. Civil Code § 3439 *et seq.*]** |

Bradley D. Sharp, the Court-appointed permanent receiver (the "Receiver") for the estate of Direct Lending Investments, LLC ("DLI"), Direct Lending Income Fund, L.P. ("DLIF"), Direct Lending Income Feeder Fund, Ltd. ("DLIFF"), DLI Capital, Inc. ("DLIC"), DLI Lending Agent, LLC, DLI Assets Bravo LLC ("DLIAB"), DLI Assets, LLC ("DLIA"), and their successors, subsidiaries, and affiliated entities (collectively, the "Receivership Entities"), hereby alleges and complains against The Strawberry Peak Trust ("Strawberry Peak") and Primus Trust Corporation solely in its capacity as trustee of Strawberry Peak ("Primus Trust") (together with Strawberry Peak, "Defendants") as follows:

## **PRELIMINARY STATEMENT**

1.      Brendan Ross ("Ross") was the principal of Direct Lending Investments (DLI), an investment firm that promised consistent returns of 10-14% to investors through its investing strategy in short term loans and similar asset-backed credit facilities to smaller and medium sized borrowers. Those promised returns were a lie. Ross was never able to achieve such consistent high returns. Ross was, however, able to attract new investment at a staggering pace, and hundreds of millions of dollars flowed into DLI from 2014 to 2018. As DLI's size exploded, Ross found the easier path to making his numbers – he just made them up. For years, Ross fraudulently inflated the values and reported returns of DLI, which allowed him to continue to attract new investments. He caused those new investment dollars to be used to help pay back those investors who redeemed, as their actual investment returns were far less than Ross reported. For years, that scheme allowed Ross to maintain the illusion that DLI was a success, until early 2019 when the music stopped suddenly. The Securities and Exchange Commission (the "SEC") learned of Ross's fraudulent scheme, after which Ross resigned and the SEC placed DLI into Receivership. By the time Ross's scheme was unveiled, the value of DLI was hundreds of millions of dollars less than had been reported to investors. DLI's investors were then stuck with those losses instead of the returns they were fraudulently promised.

2.      Ross, however, had used his time at DLI to employ, as early as 2014, a complex web of various fraudulent tactics – including self-dealing, conflicted transactions, creation of shell entities to hide assets, artificially inflated fund values to generate performance fees, and generally the operation of DLI as a Ponzi scheme – to extract as much as he could from DLI, in the guise of management fees, performance fees, service fees, and otherwise. By the time the SEC shut down Ross's scheme, Ross, his immediate family, and their sham entities had taken out over $47 million from DLI and the Receivership Entities.

3.      As part of Ross's fraudulent scheme, shortly after the SEC conducted an extensive onsite examination in 2017, Ross created a trust under Hungarian law, the Strawberry Peak Trust ("Strawberry Peak") with Primus Trust as the trustee, in order to funnel his wrongfully extracted gains from DLI offshore. From August 2017 to January 2019, Ross transferred $11,400,000 to Strawberry Peak, mediated through The Ross Trust Dated July 27, 2005 (the "Ross Family Trust"). All of the money transferred to Strawberry Peak was obtained by Ross directly from DLI or indirectly through his Robin Hill sham entities. This is an action to recover those funds for the benefit of the Receivership estate and for Ross's victims.

4.      The Receiver has entered into a tolling agreement with Ross and a number of other persons and entities associated with Ross, concerning claims that arise out of the conduct alleged herein. The Receiver therefore limits this action solely to the subsequent transfers to Strawberry Peak, as expressly permitted under Cal. Civil Code § 3439.08, but reserves his rights with respect to all persons and entities subject to the tolling agreement.

5.      Plaintiff is the Receiver of DLI and the Receivership Entities, appointed by the Court upon the recommendation of the SEC. After a lengthy investigation, on March 22, 2019, the SEC filed a complaint against DLI in this Court alleging fraud by DLI in violation of various federal securities law, including Sections 206(1) and 206(2) of the Advisors Act, Section 10(b) of the Exchange Act and Rule 10(b)(6), and

Section 17(a) of the Securities Act, and Section 207 of the Advisers Act ("SEC DLI Action").[1] The Court placed DLI into receivership on April 1, 2019.[2]

6.    On August 11, 2020, Ross was arrested by special agents of the Federal Bureau of Investigation ("FBI") following a grand jury indictment on ten counts of wire fraud, including a forfeiture allegation, filed on July 30, 2020 (the "DOJ Action").[3] The indictment charges that Ross made material misrepresentations that defrauded investors beginning as early as December 2013, and that Ross began falsifying the monthly reporting of the funds as early as April 2014. The indictment alleges that Ross caused the monthly NAV of DLIF to be cumulatively inflated by over $300 million. The DOJ Action is pending before the same Court as the SEC DLI Action.

7.    In addition to its complaint against DLI, the SEC filed a civil complaint against Ross individually in this Court on August 11, 2020, alleging that Ross defrauded investors of DLI, including the investors that invested through DLIF, and seeking disgorgement of all funds received from his illegal conduct and civil penalties (the "SEC Ross Action").[4] The SEC alleges that Ross orchestrated an intricate, multi-year fraud by inflating the value and returns for the investment fund, starting in or around early 2014 through March 2019.  The SEC Ross Action was transferred to the same court as the SEC DLI Action, as a related action.[5]

8.    At the same time that the DOJ and the SEC were pursuing their actions against Ross individually, the Receiver undertook a detailed investigation into the

---

[1] *SEC v. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt. No. 1.

[2] *Id.*, Dkt. No. 10.

[3] *United States of America v. Brendan Ross, aka "Brandon Rosen,"* Case No. 2:20-cr-00327-CSF (C.D. Cal.).

[4] *SEC v. Brendan Ross*, Case No. 2:20-cv-7202-DSF-MRW (C.D. Cal.), Dkt. No. 1.

[5] *Id.*, Dkt. No. 11.

Case No. 2:22-cv-789                                                            COMPLAINT

1    Receivership Entities' business conduct prior to April 2019. The Receiver's
2    investigation also uncovered the details of the pervasive fraud that existed from the
3    inception of DLI. Based on detailed findings, the Receiver discovered that, under
4    Ross's direction and control, the operations of DLI and DLIF had effectively morphed
5    into a Ponzi scheme no later than mid-2016, as the fraud and commingling of funds
6    grew.

7        9.    In order to maintain his fraudulent scheme, Ross covered up substantial
8    weaknesses in the loan portfolios held by the DLI-managed investment funds. For
9    example, Ross used his relationship with a counterparty called QuarterSpot to falsify
10   rebate payments by funding non-paying or late-paying loans in order to hide the fact
11   that thousands of loans were in delinquency, inflating that position alone by over $50
12   million. Ross covered up the risk he was taking when he invested in a  company that
13   factored receivables in telecom companies focusing on developing countries by
14   falsely representing that the investments would be guaranteed by higher tier
15   companies when they were not, and the investment lost over $100 million. By the
16   time DLI was placed into receivership, these losses had mounted, and the aggregate
17   shortfall was estimated at $250 million.

18       10.   While Ross's fraud was depleting DLI of value and causing massive
19   hidden losses to DLI's investors, Ross took millions of dollars from DLI for himself.
20   As a salaried employee, Ross was paid between $250,000 and $350,000 per year by
21   DLI. But Ross only extracted a fraction of his money from DLI via his salary.
22   Between June 2014 and December 2018, Ross extracted an additional $17.7 million
23   from DLI in the form of "distributions" and "payments" from DLI. On information
24   and belief, some of that money was contributed to Strawberry Peak.

25       11.   Not content to simply withdraw money from DLI, Ross kept looking for
26   innovative ways to extract more and more money from DLI. In October 2016, Ross
27   created two shell companies, Robin Hill Services, LLC ("RHS") and Robin Hill
28   Investments, LLC ("RHI") – named for the street in La Canada-Flintridge where Ross

and Jill Ross purchased a $3 million home in 2015 – in order to extract and hide money from DLI. As detailed herein, RHS and RHI were structured to siphon off value from DLI directly to Ross's two minor children, such that each of them owned 44.33% of RHS through RHI, while Ross kept 11.32% for himself and 0.02% for Jill Ross. RHS then purportedly provided "management services" for DLI under a contract signed by Brendan Ross both as manager of DLI and as of RHS, but that was nothing more than a sham cover for Ross to extract over $26 million in payments from DLI for himself and his family from October 2016 through December 2018. Most of the Strawberry Peak contributions came from funds that Ross obtained as distributions from RHI.

12.    Ross also used his family trusts to "invest" in DLI, extracting another nearly $2 million in net winnings from DLI based on what appears to be no actual investment. Ross and Jill Ross executed a subscription document for The Ross Family Trust Dated January 19, 2015 (the "2015 Family Trust") on May 1, 2016 but left the amount to be invested as blank. The Trust redeemed $1 million on this "investment" in October 2016 even though no money was invested. In December 2016, Ross took a distribution of $650,000 from DLI, and the 2015 Family Trust invested that exact same amount in December 2016. In June 2017, Ross changed the name of the account to the Ross Family Trust Dated June 5, 2017 (the "Ross Family Trust") and redeemed another $1 million (which was ultimately transferred to Strawberry Peak). Another $502,014 was redeemed periodically from October 2017 to January 2019, for over $2.5 million in total transfers out to the Ross Family Trust.

13.    Through various means and mediate sham entities, from 2014 to 2019, Ross extracted at least $47 million from DLI, with an actual intent to defraud DLI and its creditors, and then knowingly transferred $11,400,000 of those funds to Strawberry Peak without receiving any equivalent value in return. That entire amount is avoidable and recoverable pursuant to Cal. Civil Code § 3439 *et seq*.

14.    The Receiver therefore brings this proceeding pursuant to Cal. Civil

Code § 3439 *et seq.* to avoid actual fraudulent transfers and constructively fraudulent transfers to Strawberry Peak as a mediate and subsequent transferee.

## JURISDICTION & VENUE

15.     This Court has jurisdiction over this proceeding under 15 U.S.C. § 77v(a), and 15 U.S.C. § 78aa because the proceeding is ancillary to the SEC DLI Action.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts and conduct that form the basis of Receiver's causes of action occurred primarily at DLI's headquarters in Glendale, California.

17.     DLIF was located in California for purposes of Cal. Civil Code § 3439.10(b).

18.     On information and belief, Primus Trust through an affiliated entity maintains a presence in this District located at 16000 Ventura Blvd., Suite 1000, Los Angeles, CA 91436, and conducts substantial business within the State of California and has sufficient minimum contacts with the State of California for this Court to exercise general jurisdiction over it. At the time of the formation of the Strawberry Peak, Primus Trust or an affiliate thereof had a "managing partner at Primustrust, LLP" located in California at the foregoing address.

19.     Strawberry Trust was created by Ross with the express intent and sole purpose to receive subsequent transfers of funds Ross wrongfully extracted from DLI, mediated through Ross or other entities affiliated with Ross. Because that was the sole purpose of Strawberry Peak, and Strawberry Peak did intentionally accept such transfers, Strawberry Peak and Primus Trust purposefully availed themselves of California law with respect to any causes of action arising from those transfers.

20.     This action, and the injuries to Plaintiff, arise directly out of the transfers made to Strawberry Peak from a California entity.

21.     By allowing a California resident (Ross) to direct the investment decisions of Strawberry Peak, in violation of its stated policy of independence, Primus

Trust purposefully availed itself of the laws of California with respect to Strawberry Peak.

22.     The beneficiaries of Strawberry Peak, Ross's wife and children, are also residents of California. By allowing a California resident (Ross) to use Strawberry Peak to manage assets he contributed, for the benefit of other California residents, Primus Trust purposefully availed itself of the laws of California with respect to Strawberry Peak.

23.     By intentionally creating a sham entity to shield a California resident's assets from his creditors, including DLI and the Receivership Entities, and by furthering Ross's commission of his fraud on DLI and the Receivership Entities, Primus Trust could reasonably expect to be haled into the courts of California with respect to Strawberry Peak.

## **PARTIES**

24.     Plaintiff Bradley D. Sharp is the Permanent Receiver for the Receivership Entities.

25.     Plaintiff Bradley D. Sharp is a federally appointed receiver acting pursuant to Federal Rule of Civil Procedure 66, the provisions of 28 U.S.C. §§ 754, 959, and 1692, as well as this District Court's April 1, 2019 Preliminary Injunction and Order Appointing Permanent Receiver ("Receivership Order") in the SEC Action.

26.     The Court appointed the Receiver to marshal and preserve all assets of the Receivership Entities. The Receiver is authorized and empowered to investigate claims and commence legal actions for the benefit and on behalf of the Receivership Entities as the Permanent Receiver deems necessary and appropriate.

27.     The Receiver is authorized to file this action pursuant to both the Receivership Order and the Order Granting Motion of Receiver for: (1) Authority to Pursue Avoidance Actions; (2) Approval of Proposed Procedures; and (3) Form

1  and/or Limitation of Notice Under Local Rule 66-7.[6]

2      28.    Defendant The Strawberry Peak Trust ("Strawberry Peak") is a trust

3  organized under the laws of Hungary created by Brendan Ross in order to shelter his

4  assets outside the United States. Strawberry Peak received $11,400,000 from Ross,

5  mediated through the Ross Family Trust, all of which was derived from Ross's

6  fraudulent extraction of value from DLI.

7      29.    Defendant Primus Trust Corporation ("Primus Trust") is a corporation

8  located at H-1023 Budapest, Szépvölgyi str. 6, Hungary. Primus is sued in its capacity

9  as trustee of Strawberry Peak, to the extent that Strawberry Peak is not a legal entity

10  with the capacity to be sued. Primus Trust, through an affiliated entity, maintains a

11  presence in the United States in this District, at 16000 Ventura Blvd., Suite 1000, Los

12  Angeles, CA 91436, which was the location of "a Managing Partner of Primustrust,

13  LLP" at the time Strawberry Peak was formed.

14                    **<u>RELATED PARTIES</u>**

15      30.    Related Party Brendan Ross, the perpetrator of the fraudulent scheme,

16  was the founder, 100% owner, managing member, and Chief Executive Officer of

17  DLI, and a member of the board of directors. As the managing member of DLI, Ross

18  was able to control DLI and the Receivership Entities, and he had fiduciary duties to

19  each. Ross was the managing member of RHI and RHS and controlled them and the

20  Ross Family Trust. Ross personally owned 10% of RHI and 0.5% of RHS. Ross was,

21  with Jill Ross, the co-trustee and co-settlor of the Ross Family Trust. Ross was the

22  settlor of Strawberry Peak.

23      31.    Related Party The Ross Trust Dated July 27, 2005 (the "Ross Family

24  Trust") is a trust created by Brendan Ross and Jill Ross as both settlors and trustees.

25  The Ross Family Trust executed a Subscription Agreement with DLIF and received

26  transfers from DLI, DLIF, and RHI defined further below. The Ross Family Trust was

27

28
_____
[6] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt No. 526.

an alter ego of Ross created purely to shield assets wrongfully obtained by Ross's fraudulent scheme. The Ross Family Trust was the immediate or mediate transferee of the fraudulent transfers from DLI and DLIF that were subsequently transferred to Strawberry Peak.

32.     Related Party RHI is a limited liability company organized under the laws of California with entity number 201625610095 on or about September 9, 2016 and is jointly owned by Related Parties Brendan Ross (10%), S.R.1 (45%), and S.R.2 (45%). Brendan Ross is the managing member of RHI. RHI is an alter ego of Ross created purely to shield assets wrongfully obtained by Ross's fraudulent scheme.

33.     Related Party RHS is a limited liability company organized under the laws of California with entity number 201625310258 on or about September 9, 2016 and is jointly owned by Related Parties Brendan Ross (0.5%), Jill Ross (1.0%), and RHI (98.5%). Brendan Ross is the managing member of RHS. RHS was the counterparty to the sham Investment Management Services Agreement (the "IMSA") with DLI. RHI is an alter ego of Ross created purely to shield assets wrongfully obtained by Ross's fraudulent scheme.

34.     Related Party Jill Ross is the wife of Brendan Ross and was, with her husband, the co-trustee and co-settlor of the Ross Family Trust. Jill Ross owned 1% of RHS.

35.     Related Party S.R.1 is a minor child of Brendan Ross and Jill Ross, who was caused by her parents to receive fraudulent transfers and to shield assets wrongfully obtained by Ross's fraudulent scheme. S.R.1 is the 45% owner of RHI and a beneficiary of Strawberry Peak.

36.     Related Party S.R.2 is a minor child of Brendan Ross and Jill Ross, who was caused by his parents to receive fraudulent transfers and to shield assets wrongfully obtained by Ross's fraudulent scheme. S.R.2 is the 45% owner of RHI and a beneficiary of Strawberry Peak.

37.     DLI was the investment manager of the funds set up by Ross to facilitate the fraud.  DLI was 100% owned by Ross and was the General Partner of DLIF.  As set forth in the diagram below, beginning in October 2016, the DLI entities used a complex master-feeder fund structure, in which DLI was the investment manager of both the Master Fund (DLIC, defined below) and the Feeder Funds (DLIF and DLIFF, defined below).  DLI was located in Glendale, California.



38.     Direct Lending Income Fund, L.P. ("DLIF" or the "Onshore Feeder Fund") is the entity in which investors invested as a limited partner.  As the Onshore Feeder Fund, DLIF was the entity into which funds initially flowed from investors, ostensibly so that those funds could eventually be invested with DLI counterparties, although in reality the funds invested were often used to satisfy redemption requests.

DLIF did not make investments directly,[7] but rather funneled investors' money into DLIC, which operated as a master fund. The Organizational Chart above was located in the Receivership Entities' business records and sets forth the organizational structure of the Receivership Entities.

39.    DLIF was organized as a Delaware limited partnership on September 21, 2012 to operate as a private investment partnership. DLI was the general partner of DLIF, and Ross was the Managing Member of DLI, which was the General Partner of DLIF. A number of the limited partners of DLIF reside in the State of California, in Los Angeles County.

40.    Direct Lending Income Feeder Fund Ltd ("DLIFF" or the "Offshore Feeder Fund;" and together with DLIF, the "Feeder Funds"), an exempted Cayman Islands company, incorporated on June 15, 2016 and commencing operations on October 1, 2016, was formed to facilitate investments from non-United States domiciled investors, but otherwise served the same function as DLIF, just for offshore investors. DLIFF was regulated by the Cayman Islands Monetary Authority "CIMA") under the Mutual Funds Law (2015 Revision).

41.    DLI Capital, Inc. ("DLIC" or the "Master Fund") was a Nevada Corporation with its principal place of business in Glendale, California and, like the Feeder Funds, was managed by DLI.  The Master Fund was wholly owned by the Feeder Funds. As the general partner and investment manager of DLI Capital, Inc., DLI was responsible for the investment of the Master Fund's assets.  The Master Fund invested in loans, receivables and other debt obligations purchased from various loan originators.  These entities also originated loan facilities to special purpose vehicles collateralized by loans, receivables and other obligations.

42.    DLI Assets Bravo, LLC ("DLIAB") was a Nevada limited liability company that was a wholly owned subsidiary of the Master Fund.  After money

---

[7] DLIF did, however own DLI TC, LLC, an entity that was set up in connection with the realized investment in Talking Capital Partners I, LLC ("Talking Capital"), as that investment predated the master-feeder structure.

flowed from outside investors to the Feeder Funds to the Master Fund, it was then supposed to flow to DLIAB to hold the actual investment with DLI counterparties. The cash flows generated from those investments were supposed to flow back to the Master Fund and then to the Feeder Funds, but in reality were commingled with new investor money from DLIF.

43.     DLI Assets, LLC ("DLIA") was a Nevada limited liability company that was a wholly owned subsidiary of the Master Fund.  DLIA was formed to hold a portfolio of whole loans that the DLI entities acquired in foreclosure following the default of Dealstruck Holdings, Inc., a former counterparty of the DLI entities.  The cash flows generated from those loans were also supposed to flow back to the Master Fund and then to the Feeder Funds, but in reality those cash flows were also commingled with new investor money from DLIF.

44.     DLI Lending Agent, LLC ("DLILA") is a Delaware limited liability company that served as administrative agent with respect to a number of the credit facilities with counterparties in which DLI entities invested, facilitating the collection of payments, and serving as intermediary between borrowers and lenders.  DLILA held a lending license and was 100% owned by DLI.

## ROSS OPERATES DLI AND THE RECEIVERSHIP ENTITIES AS A FRADULUENT SCHEME

### A.     Structure and Stated Purpose of the DLI Entities

45.     Ross operated the DLI entities as a master/feeder structure, in which investors would first invest in the Feeder Funds, DLIF (onshore investors) and DLIFF (offshore investors). DLIF and DLIFF owned the Master Fund, DLIC, and funds from investors flowed from the Feeder Funds to the Master Fund.  Until DLIFF was formed in 2016, DLIF was the only Feeder Fund. Both Feeder Funds and the Master Fund were all managed by the same investment manager, DLI, which was 100% owned by Ross.

46.     The Master Fund had two wholly owned subsidiaries, DLIA and DLIAB. DLIAB and DLIA used the funds provided by the Master Fund to make loans to various companies.  The purported returns from those loans would then flow back up through the Master Fund to the Feeder Funds, where those proceeds were supposed to be used to pay investors in the Feeder Funds.

47.     The purported initial investment objective of the DLI entities was to net for its investors an annualized 10% to 14% return. DLI, as investment manager, advertised that it could achieve those returns by investing in short-term loans, lines of credit, purchased receivables, or other debt obligations. DLI focused on loans that originated through online lending platforms. As part of the scheme, the Master Fund's portfolio, over time, became concentrated with substantial loans to a small number of highly risky counterparties (the "Counterparties").

48.     In its early private placement memoranda sent to DLIF's potential investors by Ross or at his direction, that the loans in which it invested typically had the following qualities: (1) issued by qualified, established businesses; (2) durations of six to eighteen months; (3) fully amortizing over the term through daily or weekly ACH withdrawals from the borrower's account; and (4) may be guaranteed by one or more principals, and may be secured by the assets of the borrower. Contrary to those statements, the nature and quality of the investments were not as represented.

**B.     DLI's Initial Failure to Register with the SEC**

49.     In its initial period of operation, DLI was not registered with the SEC as an investment advisor, and its assets under management fell below the $100 million threshold for registration.  As such, even though DLI supposedly marketed itself to high-net-worth accredited investors, Ross was able to avoid regulatory scrutiny for DLI regarding the initial period of its operation.

50.     By December 2014, DLI's assets under management had reached $100 million. By January 1, 2015, the assets under management had grown to $118 million. Yet Ross failed to register DLI with the SEC as a registered investment adviser.

51.     As a result, Ross was able to continue to operate DLI without scrutiny and oversight by the SEC, and its investors were deprived of the protections afforded by the Investment Advisers Act of 1940.

52.     DLI was required to register with the Commission as early as December 2014, but no later than April 2015.

53.     Finally, on January 6, 2016, Ross registered DLI with the SEC as an investment advisor, which was approved on February 1, 2016.

## C.     DLI's Communications with Investors

54.     Ross, as DLI's managing member, regularly communicated with the DLI investors through monthly newsletters. Ross, with the assistance of others, drafted and signed the monthly newsletters, which included statements about DLI's assets under management and the Master Fund and DLI's monthly returns, which were often overstated as set forth below.

55.     Ross also provided prospective and current investors with presentation documents that included information about the Master Fund's monthly returns and other material information about the Master Fund's performance, which were often overstated as set forth below.

56.     Ross provided the DLIF and DLIFF investors with monthly account statements, including the account balance and net/profit loss figures for each investor that were derived from the Master Fund's NAV, net interest income, and each investor's percentage allocation.   Because the DLIF and DLIFF NAVs were intentionally overstated, as set forth below, the account balances were inflated, and redemptions based on those overstated NAVs were therefore artificially inflated and intentionally fictitious. The RFT Transfers were calculated and made based on fictitious NAVs, and those RFT Transfers were made in furtherance of the fraudulent scheme with actual fraudulent intent.

57.     Ross caused DLI to maintain an online investor portal that provided investors with detailed information regarding the Master Fund and its subsidiaries'

asset portfolio and specific counterparties, including the valuation of various counterparty positions by unpaid and principal balance and profit and loss information for different periods of time. However, DLI often overstated the valuation with respect to specific counterparties, as set forth below.

58. Ross caused DLI to provide to some prospective and current investors "default sensitivity analysis" spreadsheets that detailed the amount of the Master Fund's historical write downs, and sometimes extensive detail in DLI's individual investment positions such as QuarterSpot, even though Ross intentionally failed to write down its positions in loans it knew to be non-performing, especially with respect to QuarterSpot.

59. The Master Fund's audited financial statements included valuations of the Master Fund's investments as well changes in the depreciation of investments that were impacted by the inclusion of loans that were written off because they were non-performing. Valuations therefore were intentionally and artificially inflated when non-performing and underperforming loans were not properly included.

## D. The Value of the Loans That DLI Chose For Its Funds Were Falsely Overvalued

60. The majority of the assets in which the DLI entities invested, at the direction of Ross, were Level 3 assets, meaning that they were illiquid, and could not be valued through observable measures, such as market prices. The assets were supposed to be valued at fair market value, which they were not. DLI valued the positions internally, on a monthly basis. Through this internal valuation process, which was largely controlled by Ross, DLI intentionally and artificially inflated the asset values of the Master Fund and its subsidiaries, and in turn, overvalued the NAVs reported to DLIF's and DLIFF's investors.

61. At all relevant time periods, many of the DLI investment platforms chosen by Ross were in financial distress, but the resulting looming financial

1  difficulties of DLI were hidden from most of DLIF's and DLIFF's investors as DLI
2  continued to grow the positions.

3  62.    Ross operated the DLI fraudulent investment scheme with fraudulent
4  intent that lured in investors, misled them to retain their funds invested in DLIF and
5  DLIFF under the guise of promised fictitious returns, and transferred fictitious profits
6  to certain redeeming investors with the actual fraudulent intent of keeping up the
7  façade of a legitimate business.

8  63.    Central to the operation of the fraud was the efforts by Ross to conceal
9  the true nature and value of the loans with counterparties, using various deceitful acts
10 to mislead investors into thinking the investments were far more valuable than they
11 were. Some of the more egregious examples of such concealment were prevalent in
12 QuarterSpot Inc. ("QuarterSpot"), VoIP Guardian Partners I, LLC ("VOIP
13 Guardian"), Dealstruck Holdings, Inc. ("Dealstruck"), and LoanHero, LLC
14 ("LoanHero") – plus numerous other investments that had serious differences between
15 the way they were operated and the way they were represented to DLIF's and
16 DLIFF's investors.

17 64.    **QuarterSpot**.   One of the most egregious examples of Ross's
18 malfeasance was the relationship with QuarterSpot, one of DLI's earliest and largest
19 Counterparties. Through the fraudulent actions of Ross, DLI massively overstated the
20 value of its QuarterSpot position. For the period of August 2013 to June 2017, the
21 QuarterSpot loan portfolio was a significant and steadily growing position for DLI.
22 DLI represented to investors that QuarterSpot was one of DLI's best-performing
23 positions. Ross knew of serious problems relating to the QuarterSpot loan portfolio
24 and concealed these issues (in part aided and abetted by QuarterSpot itself) by, among
25 other things:

26  • Falsifying thousands of payments for non-paying or late-paying QuarterSpot
27    borrowers, causing the false appearance that non-paying loans were
       performing, and funding those payments by rebating QuarterSpot's service
28    fees;

- Affirmatively misrepresenting the status of delinquent and/or non-paying loans to DLIF and DLIFF investors and/or prospective investors;

- Falsely inflating QuarterSpot's loan balances, cumulatively, for the period 2014 to 2017, by $53 million;

- Preventing DLI from taking an adequate amount of loan reserves;

- Overstating DLI's valuation of the QuarterSpot Loan Portfolio and the Master Fund;

- Charging excessive performance and management fees;

- Overstating its return by about 2%, on average, for the period 2014 to 2017;

- Collecting over $11 million in excess fees, for the period 2014 to 2017; and

- Undermining the ability of DLIF and DLIFF investors and potential investors to assess whether continued investment in QuarterSpot, or similar assets, was warranted.

65.    Ross's conduct with respect to QuarterSpot was particularly egregious, and he personally directed the fraud that covered up over $50 million in investor losses. DLI had purchased millions of dollars in QuarterSpot loans, meaning DLI bore the economic risk of default on those loans. QuarterSpot continued to service those loans for a 17.5% fee.

66.    DLI's loan loss reserve policy with respect to QuarterSpot loans – which Ross touted as conservative to DLI's investors – was to reserve 50% if a loan was 30 days late and 100% if a loan was 60 days late (i.e., marked down to zero). Ross personally understood the significant default risk for loans where borrowers had missed a payment, emailing QuarterSpot in 2017 "The question is: When a loan is 5% or 10% behind, what is the likelihood of recovery. Of course 25% behind matters too, but I suspect that even 5% behind means the loan is done for. Doesn't matter percent principal paid already. Matters % likely to be collected AFTER it's gone 5% behind."

67.    When QuarterSpot borrowers started to fall behind on their payments,

Ross exploited a loophole in DLI's loan loss reserve policy to cover up the losses and avoid having to write down those losses. That policy allowed a loan to be marked as current even if any payment was made, and DLI would avoid having to record a loss.

68.   In a series of emails regarding DLIF's investments in loans from QuarterSpot in January 2015, Ross instructed QuarterSpot not to charge-off loans without a payment in the last 90 days (which would be consistent with QuarterSpot's stated policy approved by the Adviser) because it would "create MAJOR problems" for him requiring "serious massaging with Opus [the Fund Administrator]" and noted that I need to decide what reserves I'm creating for the full month based on my return targets, etc." (Emphasis added.) This practice, as described by Ross, operated (or would operate) as a fraud or deceit on any person buying, selling, or contemplating investing in DLIF since the net asset values used in connection with purchases or redemptions of DLIF limited partnership interest were determined based on return targets rather than the actual value of the underlying assets.

69.   At Ross's direction, each month QuarterSpot would email a "late loans report" to Ross personally, often using his gmail address, that was not available on the investor portal or to others within DLI. Ross would go through the loans and create a "BR Pays" column to direct "rebate" payments for the various late loans marked as "default" in the initial report, so that the loans would appear current. This scheme began in early 2014 and continued for years. QuarterSpot was rewarded with Ross causing DLI to dramatically increase its QuarterSpot holdings, from just $427,233 in August 2013 to $149,608,733 in June 2017.

70.   Ross knew what he was doing was wrong. He even worried in 2016 that too many loans were showing payments of exactly $50, $100, or $200, which might expose his scheme, but QuarterSpot's CEO assured Ross that such partial payments were normal as borrowers "tend to say they can afford a round number." Reassured, Ross continued with the scheme. By the time the scheme unraveled in early 2019, Ross had directed rebate payments for over 1,000 distinct loans with a total principal

balance of almost $53 million, the vast majority of which should have been written down to zero.

71.     Ross's use of outright fraud and falsification of financial data artificially inflated the value of DLIF and DLIFF, which in turn caused DLI to receive around $11 million in excess fees. As explained herein, the excess value of DLI was extracted by Ross on a near-monthly basis and was part of the $50 million that he had his sham entities extract from DLI during this time period.

72.     **VOIP Guardian**.   Another example of Ross's intentional fraudulent intent in overstating the values of the DLIF and DLIFF is the VoIP Guardian loan portfolio. Ross intentionally misrepresented the risk of that portfolio to its investors. Even though VoIP Guardian's business model was largely factoring invoices of telecommunications carriers in developing countries, which were highly risky Tier 3 companies, Ross implied to DLIF's and DLIFF's investors that the risk of its VoIP Guardian investment was low because of the purported involvement of larger Tier 1 companies such as AT&T and Verizon.

73.     Sometime in 2017, Ross was also aware that an active criminal investigation was underway in the Netherlands focused on VoIP Guardian's Tier 3 telecommunications business and counterparties, based on evidence that those counterparties appeared to be spoofing minutes to overstate charges and possibly also using those businesses for money laundering. Ross concealed that fact from investors, as well as the amounts loaned to VoIP Guardian were against receivables that showed no indicia of legitimacy. The losses in connection with the VoIP Guardian loan portfolio, which had ballooned to over $200 million at one point, will likely be well over $100 million once finalized.

74.     **Dealstruck**. Another example of the fraudulent conduct is the intentional misrepresentation of the value of loans its portfolio from Dealstruck, a company in which Ross held a personal interest. What was originally whole loan participation morphed into a credit facility. Under Ross's direction and with fraudulent intent, DLI

overstated the valuations of the poorly performing portfolio and failed to disclose the underlying weaknesses in the collateral, but instead took actions that increased the position to protect Ross's individual position at the expense of the investors. When the investment floundered by at least February 2016, DLI and Ross facilitated numerous restructurings of Dealstruck and doubled the fund's investment to nearly $67 million – apparently either to rescue Dealstruck or at least forestall DLI being forced to recognize the losses DLI was ultimately forced to foreclose on the loan portfolios in December 2016, and the liquidation was not completed until October 2019, after the Receiver was appointed.  The total return was less than 2.8%, far less than the double-digit returns promised to investors.

75.   **LoanHero**.   Ross also had a personal investment in another DLI counterparty, LoanHero, which was touted by DLI as an early successful consumer loan investment portfolio.   DLIF, and later the Master Fund after the 2016 restructuring, provided LoanHero with a loan facility at a 16% interest rate. However, as early as June 2016, DLI's internal analysis showed that the returns from LoanHero were around 6.1%, well below what was needed to make the payments on a 16% loan facility.

76.   Rather than reduce the funding and the risk, in November 2016 Ross increased the loan commitment to $25 million, and again in October 2017 to $42.5 million. In December 2017, DLI was forced to direct that DLIC foreclose on the LoanHero portfolio. However, Ross failed to disclose that fact in investor letters from December 2017 through March 2018.  As with Dealstruck, the liquidation was not completed until after the Receiver was appointed. The total return was less than 3%, far less than the double-digit returns promised to the DLI investors.

77.   The fraud with respect to QuarterSpot, VoIP Guardian, Dealstruck, and LoanHero epitomized Ross's intentional concealment and fraudulent intent, which was pervasive throughout the investment program.

78.   Several other investments, including those which have not made part of

the public record, have had similar problems. In sum, DLI's limited business investments were overrun by fraudulent conduct caused by Ross that lured and retained investors who would not have invested had they known the true facts. Some of the investments do not appear to have ever been legitimate business operations. Even those that involved nominally legitimate business operations could not support the dramatically overstated returns that DLI and Ross promised to DLIF's and DLIFF's investors.

79.     Ross continued raising capital and paying fictitious profits to investors, enabling DLI to continue its fraudulent operations under the guise of a very-successful fund. In order to continue DLI's scheme and attract new investment, Ross concealed from investors the underperformance of most of DLI's loan portfolio. When investors requested redemptions, Ross perpetuated his fraud scheme by repaying the investors' principal as well as the fictitious profits – including the RFT Transfers – to avoid detection of the fraudulent scheme.

**E.     Ross's Secret Ownership of Counterparty Stakes**

80.     As set forth above, Ross controlled all the DLI entities, and was the manager of DLI. Ross also held ownership stakes in a number of Counterparties, which were not made public or were concealed through stakes held by family members or family trusts. Because of Ross's equity interests, DLI was not in fact truly independent of these borrowers, and the transactions in which DLI directed the funds under its management to undertake invested were influenced by Ross's personal interests, to the detriment of DLIF and DLIFF.

81.     During all relevant periods, DLI, DLIF, and DLIFF were primarily controlled by Ross.  Ross held ownership in a number of counterparties, which were not disclosed or concealed through stakes held by Ross's family members or family trusts.

82.     Ross had as many as eight personal investments in Counterparties, typically not disclosed to investors or disclosed long after Ross's investment had

resulted in decisions harmful to DLIF and DLIFF. Known investments in which Ross had a personal stake include IOU Central, Inc.; LoanHero; Realty Mogul, Inc.; Nativa Capital Management LLC; QuarterSpot.; Dealstruck; VoIP Guardian; and another investment currently being unwound by the Receiver (the "Known Ross Personal Investments").

83.     The Known Ross Personal Investments received a total of $647 million out of the $1.9 billion in total loans to Counterparties, or 39%. The Receiver estimates an underreported allowance for doubtful accounts and bad debt expense of $343.7 million as of March 31, 2019, the day before the Receiver was appointed.

84.     By causing DLI to invest in the Known Ross Personal Investments, Ross caused DLI to breach its duty of loyalty to DLIF and DLIFF as their managing member, and therefore actively aided and abetted those breaches.

85.     The Receiver's investigation is ongoing and may uncover additional fraudulent activities by DLI, DLIF, and Ross, further demonstrating that DLI was operating itself and the funds under its management as a fraudulent enterprise, and as a Ponzi scheme.

## F.     DLI Extracts Millions in Fees from DLIF and DLIFF, and Causes DLI and DLIFF to Greatly Overstate Their NAVs

86.     DLI charged substantial fees for providing its investment management services to DLIF and DLIFF, generally taking two forms: management fees and performance fees. From 2014 to November 2018, after which fees were no longer paid, DLI was paid approximately $79 million in fees by DLI and DLIFF, which was DLI's only source of actual revenue.

87.     The management fees were generally around 1% of the gross asset value for each of DLIF and DLIFF. From 2014 to November 2018, after which fees were no longer paid, DLI was paid a total of $24,621,890 in management fees, as follows:

| Year | DLIF Fees | DLIFF Fees | Total Fees |
|------|-----------|------------|------------|
| 2014 | $497,872 | | $497,872 |
| 2015 | $2,333,482 | | $2,333,482 |

| Year | DLIF Fees | DLIFF Fees | Total Fees |
|------|-----------|------------|------------|
| 2016 | $5,388,953 | $96,332 | $5,485,286 |
| 2017 | $7,515,974 | $1,262,842 | $8,778,817 |
| 2018 | $5,718,825 | $1,807,608 | $7,526,433 |
| **Total** | **$21,455,107** | **$3,166,783** | **$24,621,890** |

88.     The performance fees were generally around 20% of the increased value of each of DLIF and DLIFF in any given month.  From 2014 to November 2018, after which fees were no longer paid, DLI was paid a total of $54,917,040 in performance fees, as follows:

| Year | DLIF Fees | DLIFF Fees | Total Fees |
|------|-----------|------------|------------|
| 2014 | $990,862 | $0 | $990,862 |
| 2015 | $5,791,265 | $0 | $5,791,265 |
| 2016 | $13,393,149 | $214,128 | $13,607,277 |
| 2017 | $16,222,750 | $3,007,570 | $19,230,320 |
| 2018 | $11,425,398 | $3,871,919 | $15,297,317 |
| **Total** | **$47,823,424** | **$7,093,616** | **$54,917,040** |

89.     The foregoing management and performance fees were the sole source of revenue for DLI from 2014 to 2018 and all such fees were commingled into one account at DLI. All of those fees were paid to DLI in furtherance of Ross's fraudulent scheme. Ross had actual knowledge that all such payments to DLI were made in furtherance of his fraudulent scheme.

90.     Ross also caused DLIF and DLIFF to provide reports with inflated NAVs, which served several purposes: (a) the inflated values indicated to investors that DLIF and DLIFF were better investments than they were; (b) the management fees, which were based on the inflated NAVs; (c) the performance fees charged by DLI, which were also based on the inflated NAVs; and (d) the commission payments to the brokers dealers and finders that helped Ross facilitate his scheme were based on the inflated NAVs. Because DLI's portfolio was intentionally overvalued, excess fees were charged due to the way that the fees were calculated.

91.     The NAV of DLIF was dramatically overstated beginning in 2016, and the overstatement generally became worse over time. In January 2016, the

overstatement was at least $46 million.  By January 2017, the overstatement had increased to at least $191 million.  By January 2018, the overstatement had nearly doubled, to at least $364 million.

92.     After the DLIFF restructuring in late 2016, the NAV of DLIFF was also dramatically overstated. By January 2017, the overstatement was at least $58 million. By January 2018, the overstatement had more than doubled, to at least $130 million.

## G.   DLI Commingles Investor Money so that It Can Use Funds by New Investors to Pay Redemptions

93.     Substantial redemptions and distributions were financed by fundraising efforts and paid from the commingled funds of the victims.

94.     From the inception of DLI, investor money was commingled with other investor money and loan portfolio proceeds. Some investor money was directed into the Master Fund's subsidiaries to make actual investments, while some investor money never even made it that far and was used to pay redemptions to other investors before the funds had ever been invested.

95.     For the new investor money that was actually directed to the Master Fund's subsidiaries to make investments, investor money was generally received by DLIF and DLIFF into subscription bank accounts. Those monies were then generally transferred to the DLIF and DLIFF sweep bank accounts, then to the Master Fund's sweep bank accounts, and then to the DLIAB sweep account used for funding loans to the Counterparties.   Some of those monies that actually made it to DLIAB were just cycled back to the DLIF and DLIFF bank accounts as purported loan profits from Counterparties, leading to the overstatement of the NAV and fictitious profits paid to DLIF's and DLIFF's investors.

96.     Some of the new DLIF and DLIFF investor monies, however, never made it to the Master Fund bank account. Instead, investor funds were deposited directly into the redemption bank account of DLIF or DLIFF to pay prior investors in

those funds. Ross, with fraudulent intent, sought new investor monies that were used to pay earlier investors their promised returns.

97.     From inception to March 2019, $945.3 million was paid to investors who redeemed, like the Ross Family Trust. However, only $192.4 million of those redemptions, or 20%, came from portfolio investments. Because the funds from new investments and payments from Counterparties were commingled, it would not be reasonably possible to trace the actual funds paid to the Ross Family Trust to any legitimate business revenue.

98.     Nearly 60% of the monies paid to earlier investors in connection with their redemption and distribution requests ($560.4 million) came from subscriptions from new investors. Another 20% came from the outright sale of participation proceeds.

**H.      Ponzi Scheme Indicia and Badges of Fraud**

99.     There are numerous indicia that Ross was operating the DLI entities as a Ponzi scheme at least as of April 30, 2016. Even if not an established Ponzi scheme, the factors set forth herein constitute sufficient badges of fraud that establish that the all the transfers from the Receivership Entities to Ross and entities related to Ross were made with fraudulent intent.

100.   Although DLI invested some of the investor funds in loan portfolios that involved some counterparties that had legitimate business operations, the investment in those loan portfolios was overrun by the pervasive fraud run by Ross in operating an investment scheme that fraudulently lured in investors, made ongoing misrepresentations to try to hold on to investor funds, and paid false returns to investors that sought to redeem to keep the scheme from collapsing. Ross's fraudulent operation of DLI and the Receivership Entities directly resulted in the fraudulent transfers being paid to Ross and entities related to Ross.

101.   As set forth above, Ross grossly overstated to investors both the value of the DLI-managed funds and made other material misrepresentations and omissions with the intent to defraud investors.

102.   As set forth above, later investor funds were used to pay earlier investors.

103.   As set forth above, funds were commingled, as DLIF and DLIFF failed to maintain separate investor accounts.  Ross even caused DLIF and DLIFF to use new investments to pay old investments without even bothering to direct the monies received to the Master Fund subsidiaries to be invested.

104.   Later investors generally received lower returns than earlier investors with initial reported net returns as high as 13% and later reported returns as low as 7%, on an annualized basis.

105.   To entice investments, DLI and DLIFF often paid as much as 20% commission to broker dealers and finders, generally based on overstated NAVs.

106.   Ross tried to avoid redemptions by encouraging investors to extend their investments rather than receive back their principal. The redemptions that were completed were made in furtherance of Ross's fraud and Ponzi scheme.

## I.    Ross's Fraudulent Conduct Caused Substantial Investor Losses

107.   Ross's pervasive fraud caused losses to the investment portfolio and an estimated $250.7 million in aggregate investor cash losses as of the date the receivership was commenced.

108.   The investors who remained in DLIF when the Receiver was appointed have claims in the receivership, generally at the Class 4B level pursuant to the Court-approved distribution plan (the "Distribution Plan").[8] To date, those creditors have been paid back approximately a minimum 43% of their investment based on the rising tide Distribution Plan.

109.   The Receiver estimates that investors in Class 4B will have aggregate

---

[8] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt. No. 337 (approving Dkt. No. 321).

losses in excess of $100 million even if the entire DLI portfolio is unwound.

110.   The Class 4B investors are creditors of DLI and DLIF.

111.   DLI and DLIF currently have one or more creditors whose claim arose before the transfers were made to Ross and entities related to Ross (which were then transferred to Defendants as subsequent transferees). One such example of such a creditor is identified as Generic Investor I.D. No. 128, who held a claim of $1,000,000 as of May 27, 2014 that grew to $4,000,000 as of July 26, 2016. That claim remained unpaid and outstanding as of the date of the Receiver's appointment.

112.   DLI and DLIF currently have one or more creditors whose claim arose after the transfers were made to Ross and entities related to Ross (which were then transferred to Defendants as subsequent transferees). One such example of such a creditor is identified as Generic Investor I.D. No. 1831, who held a claim of $5,000,000 as of December 31, 2018. That claim remained unpaid and outstanding as of the date of the Receiver's appointment.

## ROSS AND HIS ENTITIES WRONGFULLY EXTRACT OVER $47 MILLION FROM THE FRAUDULENT SCHEME

113.   At the same time Ross was running the DLI entities as a Ponzi and fraudulent scheme causing his investors hundreds of millions of dollars in losses, Ross also found ways to extract at least $47,662,907 for his and family's personal benefit (the "Ross Total Transfers"), of which $11,400,000 was later transferred to Strawberry Peak. Payments to Ross took several forms:

(a)   $1,242,475 in direct compensation from DLI as salary (the "Salary Transfers");

(b)   $17,756,248 in direct payments from DLI in form of "withdrawals" and "distributions" (the "Distribution Transfers" and, together with the Salary Transfers, the "Ross Insider Transfers");

(c)   $26,162,170 in indirect payments from DLI for "services" made through his sham entities, RHI and RHS, that were nothing more than mere alter

egos of Ross with no legitimate business purpose (the "Robin Hill Transfers"); and

(d)   $2,502,014 in direct payments from DLIF to the Ross Family Trust as an "investor" (the "Ross Trust Transfers").

## A.   Ross Extracts $19 million from DLI Directly

114.   Even though Ross was the 100% owner of DLI, he also had DLI paid himself a substantial salary: $265,000 in 2015 (including $53,000 contributed to an IRA), $265,400 in 2016 (also including $53,000 contributed to an IRA), $327,400 in 2017, $344,050 in 2018, and $40,626 for the first couple months of 2019. Ross received the Salary Transfers in the total amount of $1,242,475 from DLI.

115.   Ross's salary from DLI was only a small part of how he extracted value directly from DLI, however. DLI was paid substantial management and performance fees based upon the inflated NAVs of the DLI managed funds. Ross caused DLI to charge management fees of 1% of the Master Fund's gross asset value as well performance of 20% of the increased value of the Master Fund.

116.   As the 100% owner of DLI, beginning on July 2014, Ross extracted over $17.7 million from DLI as Distribution Transfers.   The vast majority of these payments were coded in DLI's accounting systems as "distributions" or "withdrawals." The Distribution Transfers were made on a monthly basis as follows:

| Month | Payment |
|---|---|
| 2014-07 | $35,000 |
| **2014 Subtotal** | **$35,000** |
| 2015-01 | $120,000 |
| 2015-02 | $70,000 |
| 2015-03 | $116,000 |
| 2015-04 | $160,000 |
| 2015-05 | $300,000 |
| 2015-06 | $350,000 |
| 2015-07 | $450,000 |
| 2015-08 | $450,000 |
| 2015-09 | $250,000 |
| 2015-10 | $50,000 |
| 2015-11 | $200,000 |
| 2015-12 | $200,000 |
| **2015 Subtotal** | **$2,716,000** |

28

| Month | Payment |
|-------|---------|
| 2016-01 | $270,000 |
| 2016-02 | $1,000,000 |
| 2016-03 | $800,000 |
| 2016-04 | $500,000 |
| 2016-05 | $1,250,000 |
| 2016-06 | $1,300,000 |
| 2016-07 | $875,000 |
| 2016-08 | $1,000,000 |
| 2016-09 | $1,000,000 |
| 2016-10 | $285,000 |
| 2016-12 | $650,000 |
| **2016 Subtotal** | **$8,930,000** |
| 2017-05 | $1,000,000 |
| 2017-06 | $350,000 |
| 2017-07 | $150,000 |
| 2017-10 | $1,800,000 |
| 2017-11 | $1,400,000 |
| 2017-12 | $655,248 |
| **2017 Subtotal** | **$5,355,248** |
| 2018-01 | $500,000 |
| 2018-06 | $220,000 |
| **2018 Subtotal** | **$720,000** |
| **Grand Total** | **$17,756,248** |

117.   Ross caused each of these Salary Transfers and Distribution Transfers to be made in furtherance of his fraudulent scheme, and as set forth above, at the expense of creditors who had a claim existing at the time of such payment, and at the expense of creditors as who had a claim that arose after the making of such payment.

118.   At least $5 million of the Ross Insider Transfers were then transferred to the Ross Family Trust, a large portion of which was transferred to Strawberry Peak as a mediate and subsequent transferee, without any value received in return and with the intent to remove those funds from the reach of creditors, as set forth herein.

**B.    Ross's Sham Robin Hill Entities**

119.   Not content to extract approximately $19 million from the DLI scheme directly, Ross also created a number of sham entities to extract funds in the form of payment for "investment management services." These sham entities were severely undercapitalized, did not provide any of the services that were called for by the services contract that Ross signed for both parties, and were mere vehicles for Ross to shield his ill-gotten gains from his creditors.

120.   On September 9, 2016, Ross formed two limited liability companies under California law with interlocking structures in order carry out this scheme, both of which were named after the street on which he lived. Robin Hill Services LLC was created as the fake "operating company," for which Ross would be the manager but own only 0.5%, and his wife Jill Ross would own only 1.0%. The other 98.5% of RHS would be owned by a fake "investment company," Robin Hill Investments LLC ("RHI"), which had no other investments except owning RHS.

121.   Ross himself only owned 10% of RHI. It was at this stage, before Strawberry Peak was created, that Ross unfortunately decided to involve his then 11 and 8 year old children, R.S.1 and R.S.2, in the scheme by making them each 45% "owners" of RHI. Ross personally held the remaining 10%. Ross's children had nothing to do with the operation of RHI, this was merely an attempt by Ross to extract value and pass that value onto his children while avoiding inheritance and estate taxes and concealing funds from investors and creditors.

122.   On September 26, 2016, RHS entered into an "Investment Management Services Agreement" with DLI (the "IMSA"), purportedly so that DLI could "obtain such streamlined and professional management services, marketing and entrepreneurial services from Contractor so as to permit Company to devote its concentrated and continuous efforts to providing investment management services at peak efficiency." IMSA at p. 1. The agreement was signed by Brendan Ross for DLI, and Brendan Ross for RHS.

123.   The IMSA even contained a list of services to be provided, in ten categories of legitimate-sounding operational services with very specific prices:

| Category | Price |
|---|---|
| Billing and Collection Services | $2,050,457 |
| Strategic Planning | $1,640,365 |
| Investment Plan Review | $1,435,320 |
| Budgeting and Projections, Business Expense Management | $1,230,274 |
| Marketing and Customer Relations | $1,127,751 |
| Business Development and Expansion, Financing Analysis and Implementation | $922,706 |

30

| Category | Price |
|---|---|
| Information Technology Services | $615,137 |
| Accounting and Legal Services Management | $512,614 |
| Liability Prevention Services, Insurance Consulting and Compliance | $410,091 |
| Training and Education Services | $307,569 |
| **Grand Total** | **$10,252,284** |

124.   These categories were mere cover for RHS's true purpose, which was to extract money from DLI and into the pockets of Ross and his family. The audited financial statements of RHS confirm the misappropriation of assets through RHS rather than a legitimate business operation.

125.   According to the 2016 RHS Audited Financials, for the three-month period from October 1, 2016 through December 31, 2016, RHS received a total of $9,883,882 from DLI for "management services fees." DLI did in fact pay such funds to RHS. The total money actually expended by RHS in 2016 was a comparatively paltry $762,934, most of which was for "professional consulting fees." There is no indication in the financial statements that anything close to the services provided in the IMSA were ever performed.

126.   The total assets in RHS at the end of 2016 were $439,707, the then current liabilities were $322,849, and total member's equity was $116,858. For a company with a $10 million annual management services contract with DLI, RHS was severely undercapitalized. That was because RHS was merely a sham, an alter ego for the Ross family to extract money from DLI. The largest cash outlay from RHS in 2016, per its financial statements, was a distribution of $8,992,000 to its members, which was 98.5% RHI, which is owned by Ross and his two children.

127.   According to the 2017 RHS Audited Financials, for the twelve-month period from January 1, 2017 through December 31, 2017, RHS received a total of $10,475,705 from DLI for "management services fees." DLI did in fact pay such funds to RHS. The total expenditures by RHS in 2017, a full year, were somewhat higher at $1,299,033, most of which were split between "marketing and conferences"

and "professional consulting fees" categories. Just as with 2016, there is no indication in the 2017 financial statements that anything close to the services provided in the IMSA were ever performed.

128.   The total assets in RHS at the end of 2017 were $168,825, the then current liabilities were $20,797, and total member's equity was $148,028. For a company with that continued to collect on its $10 million annual management services contract with DLI, RHS continued to be severely undercapitalized as an alter ego for the Ross family to extract money from DLI. The largest cash outlay from RHS in 2017, per its financial statements, was a distribution of $9,140,500 to its members, which continued to be 98.5% held by RHI.

129.   According to the 2018 RHS Financial Statements (not audited as DLI was shut down in early 2019), for the twelve-month period from January 1, 2018 through December 31, 2018, RHS received a total of $5,817,583 in for "Mgmt Service Fee Income," of which $5,802,583 came from DLI (another $15,000 was paid as an invoice by RHI). Even as DLI was falling apart throughout 2018, when Ross's scheme finally began to collapse, Ross continued to extract substantial value through RHS, taking out over $400,000 in November 2018 alone. And yet the total expenses for the entire 2018 year amounted to just $567,937, less than a tenth of RHS's annual revenue.

130.   Most of RHS's so-called revenue went to RHI, with $5,106,000 being transferred from RHS to RHI as distribution payments. By the end of the year, RHI had once again drained RHS of any value. The total assets in RHS at the end of 2018 were $138,383, the then current liabilities were $9,265, and total member's equity was $129,118. RHS was undercapitalized for any legitimate purpose, as its true purpose was to provide an additional vehicle for Ross to extract millions of dollars.

131.   A memo in Ross's files dates November 2016 further demonstrates that RHS was being set up as a sham entity. That memo, entitled "Robin Hill Services – Additional Expenses," attached hereto as Exhibit "1," shows that Ross was planning

to make a number of transactions and payments – such as paying a one-month phone bill, $1,000 to DLI for "rent," as well as $12,000 to Jill Ross and $100,000 to Brendan Ross, and to pay "something" for marketing expenses. There were even plans to create a separate website and phone, make up business cards, purchase Quickbooks, and to obtain a separate "Computer or iPad" to show some "depreciation." Although the setup of transactions and payments appears to be an effort to create the illusion of legitimacy, the details of the memo reflect the opposite. Far from establishing that RHS was legitimate, this memorandum merely demonstrates that RHS was a façade – allocation of phone bills would be "adjust[ed] next year"; a figure for rent was made up ("say $1,000 for rent")'; "some accounting and legal expenses" were to be created; "something" was to be created to pay for marketing expenses; and a "used of cheap phone" was to be purchased, among other things.

132.   Ross also arranged for several employees of DLI to also be "employees" of RHS, but RHS had no employees that were not primarily DLI employees. One spreadsheet in DLI's files listed these employees and calculated how much would be received if 20% of a year-end bonus was paid to such employees via RHS, with the remaining 80% to be paid by DLI.

133.   From October 2016 to December 2018, the Robin Hill Transfers in the amount of $26,162,170 were paid to RHS by DLI for supposed "consulting services" as follows:

| Month | Payment |
|---|---|
| 2016-10 | $2,733,341 |
| 2016-11 | $4,415,540 |
| 2016-12 | $2,735,001 |
| **2016 Subtotal** | **$9,883,882** |
| 2017-01 | $1,042,276 |
| 2017-02 | $992,973 |
| 2017-03 | $1,520,129 |
| 2017-04 | $1,505,909 |
| 2017-05 | $1,421,306 |
| 2017-06 | $730,910 |
| 2017-07 | $884,347 |
| 2017-08 | $68,764 |
| 2017-09 | $650,199 |
| 2017-12 | $1,658,892 |
| **2017 Subtotal** | **$10,475,705** |

| Month | Payment |
|---|---|
| 2018-02 | $783,064 |
| 2018-03 | $574,011 |
| 2018-04 | $686,061 |
| 2018-05 | $706,035 |
| 2018-06 | $430,508 |
| 2018-07 | $349,192 |
| 2018-10 | $65,000 |
| 2018-11 | $65,000 |
| 2018-12 | $2,143,712 |
| **2018 Subtotal** | **$5,802,583** |
| **Grand Total** | **$26,162,170** |

134.   But most or all of the Robin Hill Transfers was not used to provide any actual services. Most of that money, at least $23 million if not more, was simply transferred up to RHI, with a small remainder spent on expenses to give RHS the appearance of being a legitimate entity, when it was merely a sham alter ego of Ross and his family.

135.   At least $7.3 million of the Robin Hill Transfers were then transferred through RHI to the Ross Family Trust, a large portion of which was transferred to Strawberry Peak as a mediate and subsequent transferee, without any value received in return, as set forth herein.

**C.   The Ross Family Trust Extracts over $2.5 million from DLIF**

136.   The Ross Family Trust, for which Brendan and Jill Ross were both co-trustees and co-settlors, maintained an account with DLIF as an "investor." The 2015 Family Trust was the initial signatory to the DLIF subscription documents, with Brendan and Jill Ross signing as investors, and Brendan Ross signing for DLI on May 1, 2016.

137.   Missing from the subscription document is an amount invested, nor does it appear that any money was initially invested in this account. Before any funds were invested, a $1,000,000 redemption was made on October 17, 2016.

138.   On December 5, 2016, Ross paid himself a distribution of $650,000 from DLI. Also on December 5, 2016, the 2015 Family Trust made a $650,000 subscription

to DLIF, which was the only "principal" ever invested by the Ross Family Trust according to the records of DLI.

139.   The account was updated to the Ross Family Trust (dated June 5, 2017), and on June 7, 2017, another $1 million redemption was satisfied. And yet, even though $2,000,000 had been "redeemed" off a "principal" investment of $650,000, the Ross Family Trust account continued to receive distributions, including $245,748.60 on November 3, 2017 and several monthly distributions until January 29, 2019. The Ross Family Trust received the Ross Trust Transfers in the total amount of $2,502,014.38 from DLIF for nothing but a sham investment. A list of the Ross Trust Transfers is attached hereto as Exhibit "2."

140.   The Ross Trust Transfers were made by DLIF with an intent to defraud, hinder, and delay the creditors of DLIF. The $650,000 subscription, made long after the first redemption of over $1,000,000, was not made in good faith as it was made solely for the appearance of legitimacy.

141.   At least $1,000,000 of the Ross Trust Transfers were then transferred to Strawberry Peak as a subsequent transferee, without any value received in return, as set forth herein.

**D.** **Ross Creates Strawberry Peak to Hide at Least $11 million in Assets**

142.   Ross created the Strawberry Peak Trust ("Strawberry Peak") in 2017 under Hungarian law, using the Primus Trust Corporation in Budapest as the trustee.

143.   Strawberry Peak is a sham entity, without any legitimate business purpose, created solely for Ross to be able to shield offshore the fraudulent transfers he received from DLI.

144.   The Receiver is not aware of any direct transfers of funds from DLI or the Receivership Entities to the Strawberry Peak.

145.   However, from August 2017 to January 2019, Ross as the trust settlor caused at least $11.4 million to be transferred to Strawberry Peak. The source of these funds was a commingled mix of (i) funds distributed to Ross or trusts under his

control from RHI, which were extracted from DLI through RHS, (ii) funds distributed to Ross or trusts under his control from DLI, and (iii) at least $1 million of the Ross Trust Transfers.

146.   All of the transfers to Strawberry Peak were made at the direction of Brendan Ross, from the Ross Family Trust, in cash transfers from the Ross Family Trust to Strawberry Peak, as follows:

| Date | Transfer from Ross Trust to Strawberry Peak |
|------|---------------------------------------------|
| August 11, 2017 | $5,000,000 |
| October 20, 2017 | $2,500,000 |
| December 14, 2017 | $2,500,000 |
| August 15, 2018 | $400,000 |
| January 28, 2019 | $1,000,000 |
| Total | $11,400,000 |

(the "Strawberry Peak Transfers").

147.   Primus Trust pretended that Strawberry Peak was independent and made investment decisions, and in February 2019, even sent Ross a formal letter stating so. Ross similarly represented to the DLI compliance office in late 2018 that he had no control over the Strawberry Peak investment decisions. However, Strawberry Peak was not independent from Ross.

148.   In reality, in at least 2018 and early 2019, Ross directed that Strawberry Peak make several investments of Ross's choosing. Strawberry Peak dutifully executed the subscription documents necessary to make those investments. Despite Strawberry Peak's purported independence, Primus even asked Ross for directions on how to respond to Proxy statements issued in connection with Strawberry Peak's investments.

149.   At Ross's direction, in or around November 2018, at least one DLI employee helped managed the affairs of the Strawberry Peak Trust, including inquiring to Primus Trust to explain the details of a Hungarian fixed income security listed in the Strawberry Peak statements.

## **FIRST CLAIM FOR RELIEF**

**(For Avoidance and Recovery of Actual Fraudulent Transfers Pursuant to California Civil Code §§ 3439.04(a)(1), 3439.07(a), 3439.08(b), and California Common Law)**

150.   The Receiver incorporates by this reference paragraphs 1 through 149, above, as though set forth herein in full.

151.   This is a claim to avoid and recover the Strawberry Peak Transfers as actual fraudulent transfers pursuant to Cal. Civil Code § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyance. Strawberry Peak received the Strawberry Peak Transfers totaling $11,400,000 from August 11, 2017 through January 28, 2019, for which no equivalent value, or value of any kind, was provided.

152.   The Strawberry Peak Transfers are avoidable and recoverable as subsequent transfers, as the source of funds for the Strawberry Peak Transfers were a combination of the Ross Insider Transfers, the Robin Hill Transfers, and the Ross Trust Transfers, which were commingled into the Ross Family Trust before being transferred to Strawberry Peak, which are all avoidable as follows:

***Ross Insider Transfers***

153.   The Receiver may recover the Ross Insider Transfers – whether characterized as salary, distribution, withdrawal or otherwise – for the benefit of the estate from Ross or from the entity or entities for whose benefit the Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (b)(2).

154.   The Ross Insider Transfers made to Ross by DLI were made with the actual intent to hinder, delay, or defraud DLI's creditors.

155.   The Ross Insider Transfers made to Ross by DLI were also made in furtherance of Ross and DLI's fraud and Ponzi scheme.

156.   The Ross Insider Transfers were made as a part of Ross and DLI's fraud.

1    DLI, through the Master Fund and its subsidiaries, entered into the underlying

2    investments in furtherance of the DLI fraudulent scheme. These sham transactions

3    provided DLI with the funds it required to satisfy already existing obligations that

4    were part of the fraudulent scheme.

5          157.   As alleged herein, there are a multitude of badges of fraud present with

6    respect to the Ross Insider Transfers made to Ross. The existence and sheer number

7    of the badges of fraud present in this matter, present at the time of each of the Ross

8    Insider Transfers to Ross, indicate that Ross and DLI intended to hinder, delay, or

9    defraud its creditors.

10         158.   DLI and the other Receivership Entities had creditors whose claims arose

11    before the Ross Insider Transfers were made to Ross.

12         159.   Ross and DLI had the actual intent to delay, hinder, or defraud creditors,

13    and made the Ross Insider Transfers to delay, hinder, or defraud creditors.

14    Consequently, the Ross Insider Transfers were fraudulent pursuant to Cal. Civil Code

15    § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyances.

16         160.   Because the Ross Insider Transfers are voidable under Cal. Civil Code

17    § 3439.04(a)(1) and under California common law on fraudulent transfers, the Receiver

18    may avoid the Ross Insider Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1)

19    and 3439.08(b)(2) and under California common law on fraudulent transfers.

20         161.   The Receiver may recover the Ross Insider Transfers for the benefit of

21    the Receivership Estate from Ross or from the entity or entities for whose benefit the

22    Ross Insider Transfers were made, or any immediate or mediate transferee of such

23    initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

24         162.   As a direct and proximate result of DLI's fraudulent Ross Insider

25    Transfers to Ross, DLI and the Receivership Estate have been diminished by nearly

26    $19 million, and the remaining assets of DLI and the Receivership Estate are

27    insufficient to pay DLI's and the Receivership Estate's debts and liabilities, including,

28    most notably, the claims of the investors of DLIF and DLIFF who were defrauded by

the Receivership Entities.

163.   As set forth below, Strawberry Peak was a subsequent transferee of a portion of the Ross Insider Transfers and the Strawberry Peak Transfers are avoidable and recoverable from Strawberry Peak.

***RHS and RHI Transfers***

164.   RHS received the Robin Hill Transfers totaling $26,162,170 from DLI, for which no equivalent value, or value of any kind, was provided.

165.   The Receiver may recover the Robin Hill Transfers – whether characterized as management services or otherwise – for the benefit of the estate from RHS or from the entity or entities for whose benefit the Robin Hill Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (b)(2).

166.   RHS was 100% controlled by Ross, whose fraudulent intent can be imputed to it.

167.   The Robin Hill Transfers made to RHS by DLI were made with the actual intent to hinder, delay, or defraud DLI's creditors.

168.   The Robin Hill Transfers made to RHS by DLI were also made in furtherance of Ross and DLI's fraud and Ponzi scheme.

169.   The Robin Hill Transfers were made as a part of Ross and DLI's fraud. DLI, through the Master Fund and its subsidiaries, entered into the underlying investments in furtherance of the DLI fraudulent scheme. These sham transactions provided DLI with the funds it required to satisfy already existing obligations that were part of the fraudulent scheme.

170.   As alleged herein, there are a multitude of badges of fraud present with respect to the Robin Hill Transfers made to RHS. The existence and sheer number of the badges of fraud present in this matter, present at the time of each of the Robin Transfers to RHS, indicates that Ross, RHS and DLI intended to hinder, delay, or defraud its creditors.

171.   DLI and the other Receivership Entities had creditors whose claims arose before the Robin Hill Transfers were made to RHS.

172.   Ross, RHS and DLI had the actual intent to delay, hinder, or defraud creditors, and made the Robin Hill Transfers to delay, hinder, or defraud creditors. Consequently, the Robin Hill Transfers were fraudulent pursuant to Cal. Civil Code § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyances.

173.   Because the Robin Hill Transfers are voidable under Cal. Civil Code § 3439.04(a)(1) and under California common law on fraudulent transfers, the Receiver may avoid the Robin Hill Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and under California common law on fraudulent transfers.

174.   The Receiver may recover the Robin Hill Transfers for the benefit of the Receivership Estate from Ross, RHS, or from the entity or entities for whose benefit the Robin Hill Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

175.   RHI received a substantial amount of the Robin Hill Transfers, on information and belief in an amount exceeding $23 million, without providing equivalent or any value in return. RHI is therefore a mediate transferee of RHS with respect to the Robin Hill Transfers.

176.   As a direct and proximate result of DLI's fraudulent Robin Hill Transfers to Ross, DLI and the Receivership Estate have been diminished by over $26 million, and the remaining assets of DLI and the Receivership Estate are insufficient to pay DLI's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF and DLIFF who were defrauded by the Receivership Entities.

177.   As set forth below, Strawberry Peak was a subsequent transferee of a portion of the Robin Hill Transfers and the Strawberry Peak Transfers are avoidable and recoverable from Strawberry Peak.

***Ross Family Trust Transfers***

178.   The Ross Family Trust received payments from DLI totaling $2,502,014 (the Ross Trust Transfers), for which no equivalent value, or value of any kind, was provided.

179.   The Ross Family Trust was controlled by Ross as the co-trustee and co-settlor, whose fraudulent intent can be imputed to the Ross Family Trust.

180.   The Ross Trust Transfers made to the Ross Family Trust by DLIF were made with the actual intent to hinder, delay, or defraud DLIF's creditors.

181.   The Ross Trust Transfers made to the Ross Family Trust by DLIF were also made in furtherance of Ross and DLI's fraud and Ponzi scheme.

182.   The Ross Trust Transfers were made as a part of Ross and DLI's fraud. DLI, through the Master Fund and its subsidiaries, entered into the underlying investments in furtherance of the DLI fraudulent scheme. These sham transactions provided DLIF with the funds it required to satisfy already existing obligations that were part of the fraudulent scheme.

183.   As alleged herein, there are a multitude of badges of fraud present with respect to the Ross Trust Transfers made to the Ross Family Trust. The existence and sheer number of the badges of fraud present in this matter, present at the time of each of the Ross Trust Transfers to the Ross Family Trust, indicate that Ross, the Ross Family Trust and DLIF intended to hinder, delay, or defraud its creditors.

184.   DLIF and the other Receivership Entities had creditors whose claims arose before the Ross Trust Transfers were made to the Ross Family Trust.

185.   Ross, the Ross Family Trust, and DLIF had the actual intent to delay, hinder, or defraud creditors, and made the Ross Trust Transfers to delay, hinder, or defraud creditors. Consequently, the Ross Trust Transfers were fraudulent pursuant to Cal. Civil Code § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyances.

186.   Because the Ross Trust Transfers are voidable under Cal. Civil Code

§ 3439.04(a)(1) and under California common law on fraudulent transfers, the Receiver may avoid the Ross Trust Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and under California common law on fraudulent transfers.

187.   The Receiver may recover the Ross Trust Transfers for the benefit of the Receivership Estate from Ross or from the entity or entities for whose benefit the Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

188.   As a direct and proximate result of DLIF's fraudulent Ross Trust Transfers, DLIF and the Receivership Estate have been diminished by over $2.5 million, and the remaining assets of DLIF and the Receivership Estate are insufficient to pay DLIF's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF who were defrauded by the Receivership Entities.

189.   As set forth below, Strawberry Peak was a subsequent transferee of a portion of the Ross Trust Transfers and the Strawberry Peak Transfers are avoidable and recoverable from Strawberry Peak.

***Strawberry Peak Subsequent Transfers***

190.   Ross caused the Strawberry Peak Transfers of $11,400,000 of the Ross Insider Transfers, the Robin Hill Transfers, and the Ross Trust Transfers, to be deposited and commingled in the Ross Family Trust and then to be transferred to Strawberry Peak, without Strawberry Peak receiving any value in return.

191.   Strawberry Peak is therefore a mediate transferee of the initial transferee of the Ross Insider Transfers, the Robin Hill Transfers, and the Ross Trust Transfers, up to the amount of the Strawberry Peak Transfers.

192.   The Ross Family Trust, which was controlled by Ross and whose fraudulent intent may be imputed to the Ross Family Trust, caused the Strawberry Peak Transfers to be transferred to Strawberry Trust with the intent to hinder, delay and defraud DLI's creditors.

193.   On or about June 8, 2017, a few months after the SEC conducted an intensive three-day examination of DLI on or around March 28, 2017, that identified several concerns about DLI's business that had been mounting since at least the prior year, Ross created Strawberry Peak with the intent to hinder, delay and defraud his and DLI's creditors, solely as a sham entity for the purpose of hiding assets. Ross effectively controlled Strawberry Peak, directing Strawberry Peak to make certain investments despite Strawberry Peak's nominal independence. The records of DLI reflect that Ross initiated a call to a managing partner of Primus Trust on March 28, 2017, the very day of the SEC in person examination of DLI.

194.   On information and belief, Primus Trust was aware that the purpose of Strawberry Peak was to shield Ross's assets from his creditors and maintained the veneer of independence solely to assist Ross in hindering, delaying, and defrauding his creditors.

195.   Because Primus Trust and Strawberry Peak acted with actual knowledge that they were assisting Ross in hindering, delaying and defrauding Ross's creditors, including DLI and the Receivership Entities, Primus Trust and Strawberry Peak did not take any of the Strawberry Peak Transfers in good faith.

196.   The Receiver may recover the Strawberry Peak Transfers for the benefit of the Receivership Estate from Strawberry Peak, Primus Trust, or from the entity or entities for whose benefit the Strawberry Peak Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

197.   The Receiver is entitled to damages from Primus Trust and Strawberry Peak, in a sum of not less than $11,400,000, with interest as provided by law from the date of each payment.

## SECOND CLAIM FOR RELIEF

**(For Avoidance and Recovery of Constructive Fraudulent Transfers Pursuant to California Civil Code §§ 3439.04(a)(2), 3439.05, 3439.07(a)(1), and 3439.08(b) and California Common Law)**

198.   The Receiver incorporates by this reference paragraphs 1 through 197, above, as though set forth herein in full.

199.   This is a claim to avoid and recover the Strawberry Peak Transfers as constructive fraudulent transfers, pursuant to Cal. Civil Code, §§ 3439.04(a)(2) and 3439.05 and pursuant to California common law on fraudulent transfers. Strawberry Peak received the Strawberry Peak Transfers totaling $11,400,000 from August 11, 2017 through January 28, 2019, for which no equivalent value, or value of any kind, was provided.

200.   The Strawberry Peak Transfers are avoidable and recoverable as subsequent transfers, as the source of funds for the Strawberry Peak Transfers were a combination of the Ross Insider Transfers, the Robin Hill Transfers, and the Ross Trust Transfers, which were commingled into the Ross Family Trust before being transferred to Strawberry Peak, which are all avoidable as follows:

***Ross Insider Transfers***

201.   DLI, using the funds received from DLIF and DLIFF, transferred the Ross Insider Transfers to Ross.

202.   The Ross Insider Transfers were transferred to Ross without him giving a reasonably equivalent value to DLI, DLIF, or DLIFF in exchange for the Ross Insider Transfers.

203.   Ross had knowledge of the voidability of the Ross Insider Transfers at the time each such transfer was made.

204.   At the time the Ross Insider Transfers were paid to Ross, each of DLI, DLIF, and DLIFF was engaged in or was about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to their business

or transaction.

205.   At the time the Ross Insider Transfers were paid to Ross, each of DLI, DLIF, and DLIFF was insolvent and/or was engaged or was about to engage in a business or a transaction for which the remaining assets of each respective entity was unreasonably small in relation to the business or transaction.

206.   At the time the Ross Insider Transfers were paid to Ross, each of DLI, DLIF, and DLIFF intended to incur, or believed or reasonably should have believed each would incur, debts beyond its ability to pay them as they became due.

207.   The Ross Insider Transfers paid to Ross were also paid in furtherance of DLI's fraud and Ponzi scheme.

208.   DLI and the other Receivership Entities had creditors whose claims arose before the Ross Insider Transfers were paid to Ross.

209.   The transfer of the Ross Insider Transfers to Ross are avoidable by the Receiver.

210.   Because the payments of the Ross Insider Transfers were fraudulent under Cal. Civil Code §§ 3439.04(a)(2) and 3439.05, the Receiver may avoid the payments of the Ross Insider Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and pursuant to California common law on fraudulent conveyances.

211.   The Receiver may recover the Ross Insider Transfers for the benefit of the Receivership Estate from Ross or from the entity or entities for whose benefit the Ross Insider Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

212.   As a direct and proximate result of DLI's fraudulent transfers of the Ross Insider Transfers to Ross, DLI and the Receivership Estate have been diminished by nearly $19 million and the remaining assets of DLI and the Receivership Estate are insufficient to pay DLI's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF and DLIFF who were defrauded by the Receivership Entities.

213.   As set forth below, Strawberry Peak was a subsequent transferee of a portion of the Ross Insider Transfers and the Strawberry Peak Transfers are avoidable and recoverable from Strawberry Peak.

***Robin Hill Transfers***

214.   DLI, using the funds received from DLIF and DLIFF, transferred the Robin Hill Transfers to RHS.

215.   The Robin Hill Transfers were transferred to RHS without them giving a reasonably equivalent value to DLI, DLIF, or DLIFF in exchange for the Robin Hill Transfers.

216.   Ross, and therefore RHS, had knowledge of the voidability of the Robin Hill Transfers at the time each such transfer was made.

217.   At the time the Robin Hill Transfers were paid to RHS, each of DLI, DLIF, and DLIFF was engaged in or was about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to their business or transaction.

218.   At the time the Robin Hill Transfers were paid to RHS, each of DLI, DLIF, and DLIFF was insolvent and/or was engaged or was about to engage in a business or a transaction for which the remaining assets of each respective entity was unreasonably small in relation to the business or transaction.

219.   At the time the Robin Hill Transfers were paid to RHS, each of DLI, DLIF, and DLIFF intended to incur, or believed or reasonably should have believed each would incur, debts beyond its ability to pay them as they became due.

220.   The Robin Hill Transfers paid to RHS by DLI were paid in furtherance of DLI's fraud and Ponzi scheme.

221.   DLI and the other Receivership Entities had creditors whose claims arose before the Robin Hill Transfers were paid to RHS.

222.   The transfer of the Robin Hill Transfers to RHS is avoidable by the Receiver.

223.  Because the payments of the Robin Hill Transfers were fraudulent under Cal. Civil Code §§ 3439.04(a)(2) and 3439.05, the Receiver may avoid the payments of the Robin Hill Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and pursuant to California common law on fraudulent conveyances.

224.  The Receiver may recover the Robin Hill Transfers for the benefit of the Receivership Estate from RHS or from the entity or entities for whose benefit the Robin Hill Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

225.  RHI received a substantial amount of the Robin Hill Transfers, on information and belief in an amount exceeding $23 million, without providing equivalent or any value in return. RHI is therefore a mediate transferee of RHS with respect to the Robin Hill Transfers.

226.  As a direct and proximate result of DLI's fraudulent transfers of the Robin Hills Transfers to Ross, DLI and the Receivership Estate have been diminished by over $26 million and the remaining assets of DLI and the Receivership Estate are insufficient to pay DLI's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF and DLIFF who were defrauded by the Receivership Entities.

227.  As set forth below, Strawberry Peak was a subsequent transferee of a portion of the Robin Hill Transfers and the Strawberry Peak Transfers are avoidable and recoverable from Strawberry Peak.

***Ross Trust Transfers***

228.  DLIF transferred the Ross Trust Transfers to the Ross Family Trust.

229.  The Ross Trust Transfers were transferred to the Ross Family Trust without the Ross Family Trust giving a reasonably equivalent value to DLIF in exchange for the Ross Trust Transfers.

230.  As of at least April 30, 2016, DLIF was insolvent. As of April 30, 2016, DLIF had liabilities totaling $483 million and assets of $478 million. Under a balance

sheet test, DLIF was insolvent as the sum of its liabilities were greater than the sum of its assets at a fair valuation. It remained insolvent at least from then to April 1, 2019, when the Receiver was appointed.

231.   At the time the Ross Trust Transfers were paid to the Ross Family Trust, DLIF was not engaged in profitable activity that could have led to the repayment of all net invested capital of the DLIF investors, let alone the promised returns.

232.   At the time the Ross Trust Transfers were paid to the Ross Family Trust, DLIF operated with unreasonably small capital, as it did not have the ability to repay investors' capital with promised profits.

233.   The pervasive fraud throughout DLIF had the further effect of causing DLIF to be insolvent, because due to that fraud, all investors had a claim of restitution and rescission up to the unpaid amounts of their initial investments. All of those claims for restitution and rescission were non-contingent liabilities of DLIF.

234.   As a Ponzi Scheme, DLIF was inherently insolvent since at least April 30, 2016, and all times the Ross Trust Transfers were paid to the Ross Family Trust.

235.   At the time the Ross Trust Transfers were paid to the Ross Family Trust, DLIF was engaged in or was about to engage in a business or transaction for which DLIF's remaining assets were unreasonably small in relation to the business or transaction.

236.   At the time the Ross Trust Transfers were paid to the Ross Family Trust, DLIF was insolvent and/or was engaged or was about to engage in a business or a transaction for which the remaining assets of DLIF was unreasonably small in relation to the business or transaction.

237.   At the time the Ross Trust Transfers were paid to the Ross Family Trust, DLIF intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay them as they became due.

238.   The Ross Trust Transfers paid to the Ross Family Trust by DLIF were also paid in furtherance of DLIF's fraud and Ponzi scheme.

239.   The Ross Family Trust was controlled by Ross as the co-trustee and co-settlor, whose fraudulent intent and bad faith can be imputed to the Ross Family Trust.

240.   The $650,000 subscription payment was made by the Ross and Jill Ross, on behalf of the Ross Family Trust, in bad faith, and in furtherance of Ross and DLIF's fraudulent scheme.

241.   DLIF and the other Receivership Entities had creditors whose claims arose before the Ross Trust Transfers were paid to the Ross Family Trust.

242.   The transfer of the Ross Trust Transfers to the Ross Family Trust are avoidable by the Receiver.

243.   Because the payment of the Ross Trust Transfers is fraudulent under Cal. Civil Code §§ 3439.04(a)(2) and 3439.05, the Receiver may avoid the payment of the Ross Trust Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and pursuant to California common law on fraudulent conveyances.

244.   The Receiver may recover the Ross Trust Transfers for the benefit of the Receivership Estate from the Ross Family Trust or from the entity or entities for whose benefit the Ross Trust Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

245.   As a direct and proximate result of DLIF's fraudulent transfers of the Ross Trust Transfers to the Ross Family Trust, DLIF and the Receivership Estate have been diminished by in excess of $2.5 million and the remaining assets of DLIF and the Receivership Estate are insufficient to pay DLIF's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF who were defrauded by the Receivership Entities.

246.   As set forth below, Strawberry Peak was a subsequent transferee of a portion of the Ross Trust Transfers and the Strawberry Peak Transfers are avoidable and recoverable from Strawberry Peak.

***Strawberry Peak Subsequent Transfers***

247.   Ross caused the Strawberry Peak Transfers in the amount of $11,400,000 of the Ross Insider Transfers, the Robin Hill Transfers, and the Ross Trust Transfers, to be deposited and commingled in the Ross Family Trust and then to be transferred to Strawberry Peak.

248.   Strawberry Peak is therefore a mediate transferee of the initial transferee of the Ross Insider Transfers, the Robin Hill Transfers, and the Ross Trust Transfers, up to the amount of the Strawberry Peak Transfers.

249.   In return for the Strawberry Peak Transfers, neither Primus Trust nor Strawberry Peak provided any value.

250.   The Ross Family Trust, which was controlled by Ross and whose fraudulent intent may be imputed to the Ross Family Trust, caused the Strawberry Peak Transfers to be transferred to Strawberry Trust with the intent to hinder, delay and defraud DLI's creditors.

251.   Ross created Strawberry Peak with the intent to hinder, delay and defraud his and DLI's creditors, solely as a sham entity for the purpose of hiding assets. Ross effectively controlled Strawberry Peak, directing Strawberry Peak to make certain investments despite Strawberry Peak's nominal independence.

252.   Primus Trust was aware that the purpose of Strawberry Peak was to shield Ross's assets from his creditors and maintained the veneer of independence solely to assist Ross in hindering, delaying, and defraud his creditors.

253.   Because Primus Trust and Strawberry Peak acted with actual knowledge in assisting Ross in hindering, delaying and defrauding Ross's creditors, including DLI and the Receivership Entities, Primus Trust and Strawberry Peak did not take any of the Strawberry Peak Transfers in good faith, in addition to not providing any value in return.

254.   The Receiver may recover the Strawberry Peak Transfers for the benefit of the Receivership Estate from Strawberry Peak, Primus Trust, or from the entity or

entities for whose benefit the Strawberry Peak Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

255. The Receiver is entitled to damages from Primus Trust and Strawberry Peak, in a sum of not less than $11,400,000, with interest as provided by law from the date of each payment.

## PRAYER FOR RELIEF

WHEREFORE, the Receiver respectfully requests that this Court enter judgment as follows:

**On the First Cause of Action:**

1. For judgment avoiding and recovering the Strawberry Peak Transfers as actual fraudulent transfers.

2. For judgment against Primus Trust and Strawberry Peak in the amount of $11,400,000.

3. For interest at the legal rate from the dates of the Strawberry Peak Transfers.

**On the Second Cause of Action:**

4. For judgment avoiding and recovering the Strawberry Peak Transfers as constructive fraudulent transfers.

5. For judgment against Primus Trust and Strawberry Peak in the amount of $11,400,000.

6. For interest at the legal rate from the dates of the Strawberry Peak Transfers.

**On All Claims for Relief:**

7. For costs.

8. For such other and further relief as the Court deems appropriate.

## **JURY TRIAL DEMAND**

The Receiver respectfully demands a trial by jury of all issues triable to a jury.

RAINES FELDMAN LLP

DATED:        February 4, 2022

By:   */s/ Kathy Bazoian Phelps*
        Kathy Bazoian Phelps
        David A. Castleman
        Counsel for Bradley D. Sharp,
        Permanent Receiver